MARGARET JOHNSON, Appellant, v. MARY CLANCY, who also calls herself MARY CRAIG.

LLOYD JOHNSON, minor by next friend, Appellant, v. SAME, Defendant.

**Marriage:** SUFFICIENCY OF EVIDENCE TO ESTABLISH. A man induced a married woman to live with him, and paid the expenses of a divorce secured by her. He often declared that he would like to marry her, and fear of giving offense to his sister, alone restrained him. She testified that July 27th they went to a distant town and were married, and produced a certificate dated July 28th, which she claimed was a mistake in date. He could sign his name with great difficulty, and the procurer of the license signed the record with a mark. Acquaintances of both parties testified to their going and returning from said town on the 27th, and a number testified that she was home all day the 28th. July 31st he had the scrivener of his will prepare a bequest for her in her maiden name. He died in September, and she alone cared for him in his last sickness. His relatives claim that on July 28th another person impersonated him when they were married, and all witnesses to the marriage except one described a certain man, who was proved to be elsewhere on that day. *Held*, that they were married.

SAME. A finding that defendant was the widow of plaintiff's testator is sustained by the evidence already set out, that testator and defendant were at one time engaged to be married and the engagement was broken off because of a quarrel and that defendant married another person, that the testator succeeded in inducing her to leave her husband and maintain illicit relations with him, that he induced her to secure a divorce from her husband, paying all the expenses, that defendant was married to some one stated in the marriage certificate to bear the same name as the testator,

that the testator stated he was going to the place where the marriage occurred to be married on the day before the date of the marriage certificate and that during his last illness defendant cared for him night and day rendering all the most private offices, although the evidence shows that the marriage could not have occurred on the date of the certificate.

*Appeal from Adair District Court.*—HON. A. W. WIL-KINSON, Judge.

SATURDAY, APRIL 9, 1898.

THESE cases involve the same issue. They were tried together below, and are so submitted here. The plaintiffs are devisees of different tracts of land in Adair county, under the will of one John Craig, deceased, and as such they bring these actions to quiet their respective titles. The defendant claims to be the widow of said Craig, and entitled to the one-third part of said real estate. She asks that her title thereto be quieted, and her interest admeasured and set apart to her. The facts are fully set out in the opinion. There was a decree in defendant's favor, and plaintiffs appeal. The defendant also gave notice of appeal, but she expressly abandons, here, any claim under it.—*Affirmed.*

*Henderson & Berry* and *Gaines & Gaines* for appellants.

*Neal & Neal* and *James W. Boyd* for appellee.

WATERMAN, J.—The voluminous record in this case presents but a single question, and that is one purely of fact. Was Mary Clancy married to John Craig? The testimony is in irreconcilable conflict. It would serve no good purpose to set out the details here, but we shall endeavor to give such an outline of the case as will afford an understanding of the claims of the respective

parties and of our reasons for the conclusion at which
we have arrived. The lower court properly held that
the burden was on the defendant to establish the mar-
riage, so we shall take up first the case as she presents
it. Her own testimony, we will say, was received with-
out objection. John Craig was a locomotive fireman,
who for some years immediately prior to his death
made his home at St. Joseph, Missouri. He became
acquainted with the defendant in 1886, when she was
just verging into womanhood. An attachment grew up
between them, and in time there was an engagement of
marriage. This was broken off by reason of a quarrel,
and about the year 1889 defendant went to Cheyenne,
Wyo., where she married a man named Baker. After a
time Craig followed her to Cheyenne, and endeavored
to induce her to leave Baker, and live with him. Finally,
Craig's efforts were successful; the defendant left
Baker, and returned to St. Joseph; her railroad fare
being paid by Craig. Here she and Craig maintained
illicit relations. Through his inducements she was led
to secure a divorce from Baker; Craig paying all the
expense of the proceeding. This divorce was obtained
at Savannah, Missouri, July 18, 1894. For some time
prior to his death Craig had been in failing health.
His disease was consumption, and in July, 1894, it had
progressed so far that his condition was critical, but
the evidence is in conflict as to whether his appearance
would have given any indication of his real condition to
a casual observer. Craig often stated his desire to
marry defendant, and said that he was only restrained
from doing so through fear of giving offense to his
sister, the plaintiff in the first of these actions. He had
become alienated from his mother and his other sisters
and his brothers, and he expressed the wish to maintain
pleasant relations with plaintiff, Mrs. Johnson.

II.  So far the facts are practically undisputed. It is at this point that the real contest begins.  It is claimed by defendant that Craig intended to go to Iowa to arrange his business there, and then return, and go with her to Texas to live.  That he was to leave for Iowa in the evening of July 27, 1894, and that in the morning of that day, at his request, she went with him to Savannah, Missouri, where they were married.  Savannah is some twenty miles distant from St. Joseph. The marriage occurred about noon, and defendant and Craig then returned to St. Joseph.  The marriage certificate bears date of July 28th.  This, defendant says, is a mistake. It is undisputed that Craig left St. Joseph for Adair county, Iowa, in the evening of the twenty-seventh, and arrived there early in the day of the twenty-eighth, so that it was physically impossible that he could have been in Savannah on the latter date.  That a marriage ceremony was performed on one of those two days is conceded, and that defendant was one of the principals.  Did she marry John Craig, or did she procure some man to falsely personate John Craig for this occasion?  Defendant's story is corroborated in this way:  A witness, who was well acquainted both with Craig and defendant, accompanied them a short distance on the train when they started for Savannah, and was told by Craig they were going there to be married. On their return to St. Joseph in the afternoon, another person was met, who testifies that the marriage certificate was exhibited to her; and still another witness, who knew both, saw them in St. Joseph after their return, as they were waiting to take a street car, and was told by Craig that they had come from Savannah.  There is still other corroborative evidence.  One witness testifies that Craig told him of his purpose to marry defendant secretly; another swears that defendant was absent from home on the 27th; while a number aver that she

was at home all day of the twenty-eighth. Craig's reason for going to Savannah to be married, as given by defendant, was that the fact of their marriage might not get into the St. Joseph newspapers, and thus become known to his sister. On the other hand, the undisputed testimony discloses that the marriage license issued by the clerk of the court bears date the twenty-eighth, as already said. The clerk's cash book and his official account of the receipt of the fee for the license show the same date, and so, also, does the certificate of the justice of the peace who performed the ceremony. It may be well to say here that the justice inspected the license before he solemnized the marriage. The newspapers of Savannah, some days later, published notice of the wedding as having occurred on the twenty-eighth. Their information was obtained from the justice. In estimating the probative force of these circumstances, we must remember that they are not independent facts speaking necessarily each for itself, but they make up a related series of transactions. It is not at all improbable that a mistake in the date of the license may have led to an erroneous date in each of the other instances. All of these dates speak but little, if any, more strongly than the date of the license alone; and it rests, with an exception of which we shall next speak, upon no firmer foundation than the probability that the clerk of the court would not make a mistake in this respect. Aside from these dates, to show that the marriage occurred on the twenty-eighth, an employe in the clerk's office,—a Mrs. Ensor,—testified that on that day the clerk came into the office, and said he had been to the depot to see a couple who had taken out a license that forenoon. The clerk says it was defendant and her husband he went to see, but he does not fix the day. Mrs. Ensor professes to remember that it was the twenty-eighth, because that was her child's birthday

There is no such relation between the two facts of the clerk's speaking to her and her child's birthday as will give her evidence any greater weight than should be accorded to mere recollection of a trivial incident, first called to her mind some two months after its occurrence. The clerk who issued the license, the justice of the peace who performed the ceremony, a lawyer who was present at the wedding, and at least one other witness, describe the man whom defendant married. They did not know Craig. They expressed no opinion as to whether he was the man. They merely, from recollection, attempt to describe the dress and appearance of the person who represented himself as Craig on this occasion, and, with a single exception that will be mentioned, they depict a person quite unlike Craig. Their attention was first called to the incident about two months after the wedding. It is generally recognized that there are no matters upon which human testimony is so fallible as those relating to personal identity. The evidence here affords some confirmation of this fact. The witnesses either agree too well or they disagree. Van Buskirk gives a description that was fairly answered by Craig; while three others, whose suspicions had been directed towards one Walton as the personator of Craig, give an exact and careful description of the former. It is beyond dispute that he was not in Savannah on the twenty-eighth. Another fact which it is claimed tends strongly to show that the person who married defendant was not Craig is that when he procured the license he signed the record with a mark, while Craig could write his name. It is true that he could write his name, but it is also true that he could write nothing else. Even this required most painstaking effort. Under all the circumstances, it seems quite likely that he may have felt disinclined to undertake what to him was always something of a task, and simply made

a mark. In Craig's will, which was executed in Adair county on July 31, 1894, there is a bequest to the defendant in these words: "Two hundred dollars a year to be paid to my friend, Mrs. Mary Clancy, of St. Joe, Mo." Judge Story, who drew the will, says in his testimony that he may have put in the word "friend," but that Craig spoke of her as Mary Clancy. It should be remembered in this connection, and in connection also with the fact that he did not speak of defendant as his wife, even after she came to Adair county, as it will hereafter appear she did, that he was dying at the house of a sister from whom he was specially desirous of concealing his marriage.

III. In addition to what we have said there are some general features of the case that impress us as weighty. The relations existing between Craig and defendant prior to July 27, 1894, their feelings towards each other, as expressed by what each said and did, render the fact of their marriage probable. And it seems incredible that defendant, while expecting Craig's return in a few days, should go to a town where she was known, on the day following his departure, and have a false ceremony performed, and then, when asked to do so, exhibit to Judge Story, who was acting for plaintiff, the marriage certificate that, as she and he well knew, if the marriage occurred on the twenty-eighth, bore upon its face the stamp of its own falsity. After Craig reached Adair county, his health rapidly failed. About August 3d, at his request, a telegram was sent to defendant, asking her to come to him. She did so at once, and from that time until he died, on September 23d following, she cared for him night and day, rendering him all the most private offices. In his extremity Craig received but little attention, and less aid, from those members of his family from whom he was estranged. Even the plaintiff was quite willing to yield

the place at his bedside to the woman whose claim she now resists. In view of the defendant's boundless affection for Craig, and the great sacrifice of duty and honor that she made for his sake, one would think that the sister might now accord her the rights, as freely as she once imposed on her the duties, of a wife, and this, too, even if no formal marriage ceremony had taken place. But we find that there was a marriage ceremony. Making all due allowance for some questionable statements by defendant on collateral matters, we are impressed with the conviction that the testimony of the disinterested witnesses in her behalf, supported as it is by the probabilities arising from undenied circumstances, establishes her claim to being the lawful widow of John Craig. The decree of the trial court in each case will be AFFIRMED.